JAMES Y. PAK (SBN 304563)
*james.pak@skadden.com*
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
525 University Avenue, Suite 1400
Palo Alto, CA 94301
Telephone: (650) 470-4500
Facsimile: (650) 470-4570

KEVIN J. MINNICK (SBN 269620)
*kevin.minnick@skadden.com*
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
300 South Grand Avenue, Suite 3400
Los Angeles, CA 90071
Telephone: (213) 687-5000
Facsimile:  (213) 687-5600

P. ANTHONY SAMMI (admitted *pro hac vice*)
*anthony.sammi@skadden.com*
KURT WM. HEMR (admitted *pro hac vice*)
*kurt.hemr@skadden.com*
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
Telephone: (212) 735-3000
Facsimile: (212) 735-2000

Attorneys for Plaintiff
Crytek GmbH

# IN THE UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| CRYTEK GMBH, | Case No. 2:17-cv-08937-DMG-FFM |
| Plaintiff, | **PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT IN PART** |
| v. | |
| CLOUD IMPERIUM GAMES CORP. and ROBERTS SPACE INDUSTRIES CORP., | Date:              October 12, 2018 |
| Defendants. | Time:              9:30 a.m. |
| | Courtroom:    8C |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................ii

PRELIMINARY STATEMENT ............................................................. 1

ARGUMENT ....................................................................................... 2

    I.     SECTION 2.4 OF THE GLA PROTECTS
          CRYTEK FROM DEFENDANTS' HARMFUL CONDUCT ............ 2

          A.     Courts Have Broadly Interpreted
                  The Phrase "Engaged In Business" ............................................. 3

          B.     The Phrase "Directly Or Indirectly" Reinforces
                  The Breadth Of Conduct Prohibited By The GLA ................... 6

          C.     The Context Of The Negotiations Further
                  Supports Crytek's Interpretation Of Section 2.4 ........................ 8

    II.    CRYTEK HAS ALLEGED
          MULTIPLE BREACHES OF SECTION 2.4 ...................................... 9

CONCLUSION ................................................................................. 12

i

# TABLE OF AUTHORITIES

## CASES

*Advance Transformer Co. v. Superior Court*,
 118 Cal. Rptr. 350 (Ct. App. 1974) ...................................................................4

*Ashcroft v. Iqbal*,
 556 U.S. 662 (2009) ...........................................................................................2

*Bell Atl. Corp. v. Twombly*,
 550 U.S. 544 (2007) .......................................................................................2, 9

*Comm'r of Internal Revenue v. Nubar*,
 185 F.2d 584 (4th Cir. 1950) ............................................................................4

*E.T. Products, LLC v. D.E. Miller Holdings, Inc.*,
 872 F.3d 464 (7th Cir. 2017) ............................................................................7

*In re Vizio, Inc. Consumer Privacy Litig.*,
 238 F. Supp. 3d 1204 (C.D. Cal. 2017).....................................................4, 5, 6

*Kuntz v. EVI, LLC*,
 999 N.E.2d 425 (Ind. Ct. App. 2013) ...............................................................7

*Oasis W. Realty, LLC v. Goldman*,
 250 P.3d 1115 (Cal. 2011)..................................................................................2

*Polylok Inc. v. Bear Onsite LLC*,
 No. 3:12-cv-535, 2017 WL 3574691 (W.D. Ky. Mar. 9, 2017) .......................7

## STATUTES

18 U.S.C. § 2710(a)(4)...............................................................................................5

Cal. Civ. Code § 1647 ................................................................................................9

ii

# PRELIMINARY STATEMENT

Crytek promptly amended its pleading to address the Court's Order on Defendants' prior motion to dismiss.  (ECF No. 38.)  That Order denied Defendants' motion in almost all respects, and accordingly the requisite changes to Crytek's pleading were minimal:  Crytek removed its prayer for punitive damages and, in view of the Court's observation that "section 2.4 may support Plaintiff's theory of breach in connection with Defendants' alleged use of another software engine in Star Citizen" (*id.* at 11 n.6), Crytek expressly alleged its theory of breach in connection with that section of the General License Agreement ("GLA") at issue.

With that amendment made, this action should proceed to discovery. Defendants' motion concerns only Crytek's claim for breach of Section 2.4 of the GLA and does not otherwise challenge the sufficiency of Crytek's pleading.  As for Section 2.4, Defendants do not (and could not) deny that they conducted themselves as alleged.  Instead, they contend that the GLA should be very narrowly construed to permit their actions.  But that section is broadly worded, and its clear language proscribes the conduct alleged here on the part of Defendants.

The issues raised by Defendants' contention are inherently factual and require discovery to fully explore:  What business plans were involved in Defendants' purported "internal use of the 'Star Engine' label to describe their reworked version of CryEngine"?  (Defts.' Br. at 10, ECF No. 42-1.)  What were "the nature and purpose of Defendants' statements" concerning their switch to a different game engine?  (*Id.*)  In what lines of business have Defendants "directly or indirectly" engaged?  (*Id.* at 3.)  And, most fundamentally, what were the contractual rights that Crytek bargained for in exchange for providing development assistance to Defendants and licensing its software to Defendants at a significant discount?  Those factual disputes cannot be resolved at the pleading stage.  Defendants' motion should therefore be denied.

## ARGUMENT

As the Court explained in its previous Order, Crytek's "complaint must articulate 'enough facts to state a claim to relief that is plausible on its face.'" (ECF No. 38 at 5 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).) Crytek must plead sufficient factual content for the court "'to draw the reasonable inference that the defendant is liable for the misconduct alleged." (*Id.* at 6 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).) In particular, Crytek must plead sufficient factual content to show the plausibility that Defendants "directly or indirectly engage[d] in the business of designing, developing, creating, supporting, maintaining, promoting, selling or licensing (directly or indirectly) any game engine or middleware which compete with CryEngine." (Second Am. Compl. ¶ 36, ECF No 39.) Crytek's pleading sets forth several examples of conduct by Defendants that violates that broad prohibition. Accordingly, Crytek has stated a claim that Defendants breached Section 2.4 of the GLA.[1]

## I.  SECTION 2.4 OF THE GLA PROTECTS CRYTEK FROM DEFENDANTS' HARMFUL CONDUCT

Defendants assert that the Court's previous Order held "that the GLA does not restrict Defendants' right to use other software applications to develop its game." (Defts.' Br. at 9.) But the Court's Order in that regard addressed only one section of the GLA, not the GLA as a whole. (*Id.* (quoting the Court's analysis of "Section 2.1.2 of the GLA.").) The Order specifically recognized that "section 2.4 may support Plaintiff's theory of breach in connection with Defendants' alleged use of another software engine in Star Citizen." (ECF No. 38 at 11 n.6.) Indeed it does.

---

[1] Defendants do not contest that Crytek has sufficiently alleged the existence of a contract, Crytek's performance of its obligations under that contract, or Crytek's damages. *E.g.*, *Oasis W. Realty, LLC v. Goldman*, 250 P.3d 1115, 1121 (2011) (enumerating the elements of a claim for breach of contract).

2

1   Section 2.4 of the GLA expansively prohibits Defendants from engaging in
2   numerous forms of conduct that could harm CryEngine's competitive standing
3   among competing game engines:

4   **During the Term of the License**, or any renewals thereof, **and for a**
5   **period of two years thereafter, Licensee**, its principals, and Affiliates
6   **shall not directly or indirectly engage in the business of** designing,
7   developing, creating, supporting, maintaining, **promoting**, selling or
8   licensing (directly or indirectly) **any game engine** or middleware which
9   **compete with CryEngine**.

10  (Second Am. Compl. ¶ 36.)   Defendants repeatedly accuse Crytek of ignoring or
11  omitting what they view as "the key language" of that provision — *i.e.*, "engage in
12  the business of" — yet that language is rendered in bold type in Crytek's Second
13  Amended Complaint precisely as it appears above.   As explained below, Crytek's
14  complaint sufficiently alleges that Defendants directly or indirectly engaged in
15  numerous business activities enumerated in Section 2.4 and that Crytek's competitive
16  interests were harmed as a result.

17  **A.   COURTS HAVE BROADLY INTERPRETED**
18  **THE PHRASE "ENGAGED IN BUSINESS"**

19  As Defendants would have it, they would be exposed to liability under Section
20  2.4 only if they chose to completely recast their business as "a competing game
21  engine business." (*E.g.*, Defts.' Br. at 8.)   In their view, they are free to engage in
22  any business activity prohibited by that Section as long as that activity could be
23  characterized as "incidental to Defendants' business as a game developer and
24  publisher." (*Id.*)   But nothing in that Section indicates that the parties to the GLA
25  intended that narrow construction, and indeed courts that have construed the phrase
26  "engage in the business of" in other contexts have not given that phrase such a
27  narrow construction.

28

3

1    As the California Court of Appeal noted after evaluating several California

2  and federal authorities interpreting the phrase "engaged in business" in a statutory

3  context, that phrase encompasses far more than Defendants suggest:

4         [T]he phrase "engaged in business" is capable of a wide variety of

5         meanings. . . .  [I]ts meaning in a given case "is to be determined not *in*

6         *vacuo*, but with reference to the purpose for which the statute was

7         passed."   Thus, the phrase may be found to encompass almost any

8         activity engaged in for profit with "frequency and continuity" when

9         such interpretation is consistent with the purpose of the statute in which

10        it is embodied.

11  *Advance Transformer Co. v. Superior Court*, 118 Cal. Rptr. 350, 358 (Ct. App. 1974)

12  (quoting *Comm'r of Internal Revenue v. Nubar*, 185 F.2d 584, 586 (4th Cir. 1950)).[2]

13    Judge Staton's recent decision *In re Vizio, Inc. Consumer Privacy Litigation*,

14  238 F. Supp. 3d 1204 (C.D. Cal. 2017), is particularly instructive here.  In that case,

15  as in *Advance Transformer Co.*, Judge Staton considered the meaning of the phrase

16  "engaged in the business of" in the context of a statute.  Vizio, a defendant in that

17  case, is a manufacturer of so-called "smart" television sets that collect data based on

18  consumers' viewing habits and sell that data to content providers and advertisers.  *Id.*

19  at 1211-12.   The complaint against Vizio included civil claims under the Video

20  Privacy Protection Act, which protects certain consumer information collected by a

21  "video tape service provider," defined to mean "any person, engaged in the business,

22  in or affecting interstate or foreign commerce, of rental, sale, or delivery of

23  prerecorded video cassette tapes or similar audio visual materials . . . ."  *Id.* at 1221

24

25  [2]    Although Defendants cite a number of authorities concerning general

26  principles of contract interpretation, none of those authorities concerns interpreting

27  the phrase "engaged in business."

28

1   (quoting 18 U.S.C. § 2710(a)(4)).  Vizio and other defendants moved to dismiss the

2   claims on the basis that they were not "engaged in the business" governed by the

3   statute, *i.e.*, delivering prerecorded audio visual programming.  *Id.*  Rather, they

4   suggested that they simply sold television sets.

5       Judge Staton noted that "a defendant can be 'engaged in the business' of

6   delivering video content even if other actors *also* take part in the delivery of the same

7   video content." *Id.*  The key was whether the defendant engaged in *directed* activity:

8   "[F]or the defendant to be engaged in the business of delivering video content, the

9   defendant's product must not only be substantially involved in the conveyance of

10  video content to consumers but also significantly tailored to serve that purpose." *Id.*

11  The court offered an example to illustrate that distinction:  A "letter carrier who

12  physically places a package that happens to contain a videotape into a consumer's

13  mailbox" is plainly involved in "delivering" video content, but is not "'engaged in the

14  business' of delivering video content because her job responsibilities are in no way

15  tailored to delivering packages that contain videotapes as opposed to any other

16  package." *Id.*

17      Applying that distinction, Judge Staton held that the complaint in *Vizio*

18  sufficiently alleged that the defendants *were* "engaged in the business" governed by

19  the statute for several reasons, including that the complaint's allegations supported a

20  "reasonable inference" that Vizio "enters into agreements with . . . content providers

21  to enable consumers to access their programming on Vizio's Smart TVs."  *Id.* at

22  1222.  Even though Vizio did not create that video content on its own, contracting

23  with other businesses to facilitate such deliveries was an important part of its

24  business model.[3]

25  _____

26  [3]     Other factors supporting the court's decision included that Vizio advertised its
27  product as a means to access other providers' content and that Vizio's televisions

*(cont'd)*

28

PLAINTIFF'S OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS THE SECOND AMENDED COMPLAINT IN PART

1    That same analysis applies here as well: even though Defendants have not

2    recast themselves solely as a game engine development business, it is plain that

3    Defendants contract with other businesses to engage in the development and

4    promotion of game engines. Even before discovery, it is beyond dispute that the

5    Defendants entered into an agreement concerning promotional and developmental

6    efforts directed at one game engine — CryEngine. The public record further

7    suggests that they have engaged in conduct consistent with having both (a) entered

8    into a similar agreement directed at a competing game engine, Lumberyard (Second

9    Am. Compl. ¶¶ 37-38); and (b) taken steps toward developing their own competing

10   game engine, Star Engine. (*Id.*) That business activity violates Section 2.4.

11   Significantly, in *Vizio*, Judge Staton rejected the defendants' implicit

12   contention that only one party may be "engaged in" a particular business at any given

13   time. 238 F. Supp. 3d at 1222 (rejecting the "implicit premise that there can be only

14   one video tape service provider in any transaction, and, because the content provider

15   (like Hulu or Netflix) does fit within the statutory definition of a video tape service

16   provider, Vizio cannot"). Here, Defendants are not the primary developers of

17   Lumberyard — a CryEngine competitor — but that does not exclude the possibility

18   that Defendants' intentional promotional and development activities concerning

19   Lumberyard and other game engines constitute being "engag[ed] in business" with

20   regard to those game engines. To the contrary, Defendants plainly are so engaged.

21   **B.     THE PHRASE "DIRECTLY OR INDIRECTLY" REINFORCES**

22          **THE BREADTH OF CONDUCT PROHIBITED BY THE GLA**

23   Section 2.4's broad prohibition is further qualified by the phrase "directly or

24   indirectly," which serves to expand the range of conduct covered by that Section.

25   _____

*(cont'd from previous page)*

26   directly competed with other devices that also allowed access to that content. *Vizio*,

27   238 F. Supp. 3d at 1222.

28

PLAINTIFF'S OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS THE SECOND AMENDED COMPLAINT IN PART

1   The Seventh Circuit recently construed a so-called "noncompete" contract provision
2   that used that qualification, prohibiting sellers of a business from "assisting anyone
3   involved in any company either directly or indirectly engaged in the same industry"
4   and further providing that those sellers were "forbidden to *directly or indirectly* own,
5   operate, invest in, advise, render services for, or otherwise assist any such
6   competitor."  *E.T. Products, LLC v. D.E. Miller Holdings, Inc.*, 872 F.3d 464, 466
7   (7th Cir. 2017) (emphasis added). The Seventh Circuit concluded that the phrase
8   "directly or indirectly" foreclosed the narrow construction of the agreement adopted
9   by a district court:

> 10   The judge thought that the noncompete wasn't triggered unless [the
> 11   other company] engaged in all the same aspects of the additive business
> 12   as [the plaintiff]: blending, packaging, marketing, and selling.  That's
> 13   not correct.  Two companies need not perfectly mirror each other before
> 14   they are considered competitors, and the inclusion of the phrase
> 15   "directly or indirectly" in the noncompete was designed to preclude
> 16   precisely this kind of narrow construction.  That language means, if
> 17   nothing else, that complete overlap isn't required.

18   *Id.* at 470.  The court relied on a decision of the Indiana Court of Appeals concerning
19   a provision that likewise "prevented the seller from assisting a competitor directly or
20   indirectly"; the Indiana court "wrote that the 'legal effect of the provision is to restrict
21   all competitive activity in any capacity.'"  *Id.* at 468 (quoting *Kuntz v. EVI, LLC*, 999
22   N.E.2d 425, 430 (Ind. Ct. App. 2013); *see also Polylok Inc. v. Bear Onsite LLC*, No.
23   3:12-cv-535, 2017 WL 3574691, at *11-12 (W.D. Ky. Mar. 9, 2017) ("[T]he phrase
24   'directly or indirectly' implies that the parties intended for the non-compete
25   agreement to be read broadly.").  Here, as in those cases, the inclusion of the phrase
26
27
28

7

1  "directly or indirectly" in Section 2.4 forecloses the narrow interpretation of that

2  Section that Defendants urge this Court to adopt.[4]

3  **C.   THE CONTEXT OF THE NEGOTIATIONS FURTHER
         SUPPORTS CRYTEK'S INTERPRETATION OF SECTION 2.4**

4

5       As shown above, Defendants' interpretation relies on an unduly narrow

6  interpretation of the phrase "engage in the business of" and effectively reads the

7  phrase "directly or indirectly" out of the contract.  But Defendants' defense of their

8  GLA-breaching conduct as only "incidental to Defendants' business as a game

9  developer and publisher" also fails to account for the context of the parties'

10 negotiations.

11      Here, Crytek expended significant technical and artistic resources when

12 Defendants' businesses were in their infancy to assist Defendants in trying to make

13 Star Citizen successful. (Second Am. Compl. ¶ 14.) Crytek also allowed Defendants

14 to use CryEngine at a below-market licensing fee and royalty buyout payment. (*Id.*

15 ¶¶ 16, 35.)   In return for that developmental and financial assistance, Crytek

16 anticipated and bargained for the benefit of Defendants' promotional efforts

17 concerning the game engine used in Star Citizen. (*Id.* ¶ 39.) Crytek also anticipated

18 and bargained for the benefit of Defendants' work to develop and maintain that game

19 engine. (*Id.* ¶¶ 40-45.)  Regardless of how they now describe their business in the

20 context of this litigation, when the parties negotiated the GLA, Defendants promised

21 that they would devote their promotional and development efforts concerning Star

22 Citizen's game engine to CryEngine, and in return for those promises Crytek

23 conferred significant benefits on Defendants.   That was the deal.   Those

24 circumstances should inform the Court's construction of Section 2.4.  *See* Cal. Civ.

25

26 [4]      As with the phrase "engaged in business," none of the authorities on which
   Defendants rely concerns interpreting the phrase "directly or indirectly."

27

28
PLAINTIFF'S OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS THE SECOND AMENDED COMPLAINT IN PART

1  Code § 1647 ("A contract may be explained by reference to the circumstances under
2  which it was made, and the matter to which it relates.")  When Defendants elected to
3  devote their efforts toward other engines, such as Lumberyard and Star Engine, they
4  breached their obligations to Crytek.

## II.   CRYTEK HAS ALLEGED MULTIPLE BREACHES OF SECTION 2.4

6        Crytek need not allege every piece of evidence that it already has or that it
7  may obtain in discovery to advance beyond the pleading stage.  The complaint "must
8  contain 'more than labels and conclusions' or 'a formulaic recitation of the elements
9  of a cause of action,'" but "need not contain 'detailed factual allegations.'"  (ECF No.
10 38 at 5 (quoting *Twombly*, 550 U.S. at 555).)  Here, Crytek has set forth factual
11 allegations sufficient to show several examples of Defendants' conduct in violation
12 of Section 2.4:

13       ***First***, Crytek has pleaded that in September 2016, Defendants began to
14 publicly claim that they were using what they described as "Star Engine" in Star
15 Citizen in place of CryEngine.  (Second Am. Compl. ¶ 37.)  That activity was
16 inconsistent with Section 2.4:  by doing so, Defendants were "directly . . . engag[ing]
17 in the business of designing, developing, creating, supporting, maintaining [and]
18 promoting" a game engine that competed with CryEngine.  (*Id.* ¶ 36.)  That activity
19 was also inconsistent with Defendant's obligation to provide Crytek with any
20 improvements they made to CryEngine during the development of Star Citizen.  (*Id.*
21 ¶¶ 40-45.)  Oddly, Defendants now choose to highlight their founder Chris Roberts's
22 public statement that Star Engine is "quite detached now from what the base
23 CryEngine is."  (Defts.' Br. at 2 n.2, 10.)  Defendants' promotional statements
24 concerning their own game engine (including, but certainly not limited to, this very
25 statement) are at the core of their violative conduct.  Their contention that Star
26 Engine is not in competition with CryEngine — which is inconsistent with
27 Defendants' publicly observable conduct concerning Star Engine — cannot be

28

1  resolved at the pleading stage based only on the arguments of Defendants' counsel,
2  but must be addressed in discovery.

3  **Second**, Crytek has pleaded that in December 2016, Defendants announced
4  that they would no longer use CryEngine for Star Citizen and would instead use a
5  competing game engine, Lumberyard. (Second Am. Compl. ¶ 37.) That
6  announcement was coupled with promotional efforts concerning Lumberyard and the
7  prominent display of Lumberyard's trademarks in Star Citizen — the very same type
8  of recognition for which Crytek negotiated in the GLA. (*Id.* ¶¶ 28-35.) Defendants'
9  publicly observable conduct strongly supports an inference that Defendants have
10  entered into promotional and marketing arrangements concerning Lumberyard
11  similar to the arrangements with Crytek contained in the GLA.[5] Crytek will obtain
12  and review those arrangements in discovery. Crytek cannot be faulted for not having
13  Defendants' non-public agreements in its possession at the pleading stage.

14  **Third**, Crytek has pleaded that for nearly two years, "Defendants have
15  continued to breach Section 2.4 of the GLA by directly or indirectly developing,
16  creating, supporting, maintaining, and promoting not only Lumberyard but also the
17  so-called 'Star Engine.'" (Second Am. Compl. ¶ 38.) Defendants' breach of Section
18  2.4 concerns ongoing, directed activity. Neither Crytek's complaint nor Defendants'
19  conduct are limited to isolated instances, as Defendants suggest. Crytek expects that
20  the proof will show that Defendants have continued to develop "Star Engine" and
21  promote it to the public in multiple events, contrary to Defendants' assertion that the
22  term is only for "internal" use and unrelated to any plans to license Star Engine to
23  other developers. The proof will also show that Defendants have engaged in
24
25  [5]      Several of Crytek's discovery requests seek to elicit non-public evidence
26  concerning any such arrangements. (*E.g.*, Crytek's Requests For Production Nos. 2,
     3, 27, 29, 43, and 56 (ECF No. 30-2 Ex. A).)
27
28
                                                    10
     PLAINTIFF'S OPPOSITION TO DEFENDANTS'
     MOTION TO DISMISS THE SECOND AMENDED COMPLAINT IN PART

extensive efforts toward promoting Lumberyard, including by providing testimonials and other appearances in aid of marketing efforts for that game engine. If Defendants wanted to do those things without violating their obligations to Crytek, they could have done so by terminating the GLA and then waiting for the two-year period specified in Section 2.4 to expire. They chose instead to breach. Hence this suit.

In short, the Second Amended Complaint states a claim for breach of Section 2.4 of the GLA in addition to the other sufficiently pleaded claims that the Court recognized in its previous Order (ECF No. 38). This action should now proceed to discovery so Crytek can continue to develop the factual evidence necessary for it to carry its ultimate burden of persuasion on its claims.

PLAINTIFF'S OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS THE SECOND AMENDED COMPLAINT IN PART

## CONCLUSION

For the foregoing reasons, Defendants' Motion To Dismiss The Second Amended Complaint In Part should be denied in its entirety.

Dated: September 21, 2018                    Respectfully submitted,

                                             */s/ James Y. Pak*

KEVIN J. MINNICK (SBN 269620)                JAMES Y. PAK (SBN 304563)
*kevin.minnick@skadden.com*                  *james.pak@skadden.com*
SKADDEN, ARPS, SLATE,                        SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP                           MEAGHER & FLOM LLP
300 South Grand Avenue, Suite 3400           525 University Avenue, Suite 1400
Los Angeles, CA 90071                        Palo Alto, CA 94301
Telephone: (213) 687-5000                    (650) 470-4500
Facsimile:  (213) 687-5600                   (650) 470-4570

P. ANTHONY SAMMI                             ***Attorneys for Plaintiff***
(admitted *pro hac vice*)                    ***Crytek GmbH***
*anthony.sammi@skadden.com*
KURT WM. HEMR
(admitted *pro hac vice*)
*kurt.hemr@skadden.com*
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
Telephone: (212) 735-3000
Facsimile: (212) 735-2000

PLAINTIFF'S OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS THE SECOND AMENDED COMPLAINT IN PART