**JOSEPH R. TAYLOR** (SBN 129933)
**JEREMY S. GOLDMAN** (SBN 306943)
**AZITA ISKANDAR** (SBN 280749)
**FRANKFURT KURNIT KLEIN & SELZ, P.C.**
2029 Century Park East, Suite 1060
Los Angeles, California 90067
Telephone: (310) 579-9600
Facsimile: (310) 579-9650
E-Mail:  jtaylor@fkks.com
         jgoldman@fkks.com
         aiskandar@fkks.com

Attorneys for Defendants CLOUD IMPERIUM GAMES CORP.
and ROBERTS SPACE INDUSTRIES CORP.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CRYTEK GMBH, | Case No. 2:17-CV-08937 |
| Plaintiff, | [HON. DOLLY M. GEE] |
| vs. | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR A BOND PURSUANT TO CAL. CIV. P. CODE § 1030** |
| CLOUD IMPERIUM GAMES CORP. and ROBERTS SPACE INDUSTRIES CORP., | |
| Defendants. | |
| | Date:  April 26, 2019 |
| | Time: 9:30 AM |
| | Courtroom:  8C |

# TABLE OF CONTENTS

I.    INTRODUCTION ...................................................................................................1

II.   RELEVANT FACTS .............................................................................................2

    A.   Cloud Imperium Games, *Star Citizen*, and *Squadron 42* ..............................2

    B.   The GLA ....................................................................................................2

    C.   Lumberyard ................................................................................................3

    D.   The Action Thus Far ..................................................................................3

        1.   Initial Complaint .............................................................................3

        2.   First Amended Complaint ................................................................4

        3.   Second Amended Complaint ...........................................................4

    E.   What Remains in this Action ......................................................................4

III.  ARGUMENT ........................................................................................................5

    A.   Foreign corporations suing in California may be ordered to post a security bond when there is a "reasonable possibility" the defendant will be entitled to its costs and fees. .....................................................................................5

    B.   Crytek is a foreign (German) corporation. ..................................................7

    C.   Crytek reeks of chronic financial decline....................................................7

    D.   The GLA and the Copyright Act provide for fee-shifting. ...........................9

    E.   CIG has already prevailed against Crytek's broadest claims.......................10

    F.   CIG will prevail on Crytek's remaining claims. .........................................11

    G.   CIG's likelihood of prevailing is even stronger in light of Crytek's additional burden of proving that each of the alleged breaches was "intentional" pursuant to GLA paragraph 6.1.4.................................................................19

    H.   The amount of the bond requested by CIG is reasonable from the viewpoints of both parties............................................................................................21

IV.   CONCLUSION..................................................................................................23

1

2

# **TABLE OF AUTHORITIES**

3

## **Cases**

4

*AF Holdings LLC v. Navasca*, No. 12 Civ. 2396, 2013 WL 450383 (N.D. Cal. Feb. 5,
2013 ...................................................................................................................... 1, 6

5

*AF Holdings, LLC v. Magsumbol*, No. 12 Civ. 4221, 2013 WL 12149267 (N.D. Cal. May
30, 2013)..................................................................................................................5, 7

6

*Aguilera v. Pirelli Armstrong Tire Corp.*, 223 F.3d 1010 (9th Cir. 2000) ......................18

7

*Code Rebel, LLC v. Aqua Connect, Inc.*, No. 13 Civ. 4539, 2014 WL 2890242 (C.D. Cal.
June 24, 2014)..........................................................................................................6, 7

8

*Drake v. Martin*, 30 Cal. App. 4th 984 (1994) ...............................................................15

9

*Eidsmore v. RBB, Inc.*, 25 Cal. App. 4th 189 (1994).......................................................17

*Elmotec Statomat, Inc. v. Visteon Corp.*, No. 07-13884, 2009 WL 1034929 (E.D. Mich.
Apr. 17, 2009)..............................................................................................................19

10

11

*Gabriel Techs. Corp. v. Qualcomm Inc.*, No. 08 Civ. 1992, 2010 WL 3718848 (S.D. Cal.
Sept. 20, 2010)...............................................................................................................7

12

*Interlabservice, OOO v. Illumina, Inc.*, No. 15 Civ. 2171, 2016 WL 5817062 (S.D. Cal.
October 3, 2016) ............................................................................................................5

13

*Kourtis v. Cameron*, 358 F. App'x 863 (9th Cir. 2009) ....................................................7

14

*Layton v. West*, 271 Cal. App. 2d 508 (1969) .................................................................15

15

*Leonard v. Rose*, 65 Cal. 2d 589, 592 (1967) .................................................................15

*Lewis v. YouTube, LLC*, 244 Cal. App. 4th 118 (2015)...................................................22

16

*MDY Indus., LLC v. Blizzard Entm't, Inc.*, 629 F.3d 928 (9th Cir. 2010)........................13

17

*Metro. Life Ins. Co. v. Noble Lowndes Int'l, Inc.*, 643 N.E.2d 504 (N.Y. 1994) .............21

*RCRV Inc. v. J L J Inc.*, No. 2:12-cv-07609-SVW-FMO, 2013 WL 12133691 (C.D. Cal.
Jan. 30, 2013)..............................................................................................................20

18

19

*Reynolds Metals Co. v. Alperson*, 25 Cal. 3d 124 (1979)................................................10

20

*Simulnet E. Assocs. v. Ramada Hotel Operating Co.*, 37 F.3d 573 (9th Cir. 1994)........2, 6

21

*Taylor v. Johnston*, 15 Cal. 3d 130 (1975) ....................................................................13

*Unicom Systems, Inc. v. Farmers Group, Inc.,* 405 Fed.Appx. 152 (9th Cir. 2010).........10

22

## **Statutes**

23

17 U.S.C. § 505 ............................................................................................................... 1

24

Cal. Civ. Code § 1655 ....................................................................................................16

Cal. Civ. Code § 1657 ....................................................................................................15

25

Cal. Civ. Proc. Code § 1030 ....................................................................................*passim*

26

Cal. Civ. Proc. Code § 2076 ...........................................................................................14

German Commercial Code § 325 (1a) ...............................................................................8

27

28

# I.   INTRODUCTION

Defendants Cloud Imperium Games Corp. and Roberts Space Industries Corp. (together, "CIG") request an order requiring Plaintiff Crytek to post a bond in the amount of $2,193,298.45 to secure the award of attorneys' fees and costs that CIG will be entitled to receive as the prevailing party in this action.  The requested bond will prevent CIG from holding the bag when Crytek, an overseas corporation teetering on the brink of insolvency and that has already demonstrated a "kitchen sink" approach to this proceeding, cannot make good on contractual[1] and statutory[2] cost and fee awards.

The Court is empowered to stop this injustice by ordering Crytek to post an appropriate security bond pursuant to section 1030 of the California Code of Civil Procedure.  To sustain its request for a bond, CIG need only demonstrate that Crytek is a foreign corporation (undisputed), and a mere "reasonable possibility" that CIG will be deemed the prevailing party in this action, a "relatively low" standard.[3]  CIG already prevailed against two of Crytek's most far-reaching claims.  What remain are contrived trifles doomed by dispositive evidence and the complete absence of damages.

Major unfair risk and prejudice loom without the bond.  In the past five years, myriad reported financial problems have plagued Crytek, forcing it to shutter most of its studios and withhold employee pay.  Many employees fled.  Several landed at CIG, which was using Crytek's CryEngine platform to develop the well-funded *Star Citizen* video game at the center of this lawsuit.  In 2014, Crytek received a desperate dose of cash from a deal giving Amazon the rights to rebrand and resell CryEngine as its own.  In 2016, Amazon began offering its customers free access to "Lumberyard," a game engine

---

[1] Paragraph 10.8 of the Game License Agreement dated as of November 20, 2012 (the "GLA"), attached as Exhibit A to the concurrently-filed declaration of Ortwin Freyermuth (the "Freyermuth Decl.").

[2] 17 U.S.C. § 505.

[3] *AF Holdings LLC v. Navasca*, No. 12 Civ. 2396, 2013 WL 450383, at *1 (N.D. Cal. Feb. 5, 2013) (ordering copyright plaintiff to post security under CCP § 1030).

derived from CryEngine.  As Amazon's new platform became available for free, Crytek's CryEngine business further spiraled.  Crytek replaced its CEO, shed additional studios and assets, and borrowed millions from banks and private investors.

The Ninth Circuit directs courts to weigh the "background and purpose of the suit" when deciding whether to order a bond under California Code of Civil Procedure § 1030.[4]  Here, Crytek is cash-starved and craves money.  With eyes on the millions of dollars in crowdfunding that CIG raised for game development, Crytek hired a big law firm to use expensive litigation to retrade the Game License Agreement.  However, Crytek's merits are not there, the lawsuit has not gone well, and the future bodes worse.  Meanwhile, CIG continues to accrue significant litigation expense properly shifted to Crytek in the final reckoning.  But Crytek's financial position suggests that CIG will find Crytek judgment proof when that time comes.  Crytek should be prevented from evading the consequences of pursuing this irresponsible action by posting a sufficient security bond.

## II.   RELEVANT FACTS

### A.   Cloud Imperium Games, *Star Citizen*, and *Squadron 42*

Since 2012, CIG has been developing the video games *Star Citizen* and *Squadron 42*.  Freyermuth Decl. ¶ 4.  *Star Citizen* will be an online, multiplayer space adventure, trading, and dogfighting game.  *Id.* ¶ 5.  *Squadron 42* will be a story-driven, single-player campaign set in the *Star Citizen* universe.  *Id.* ¶ 6.  Only preliminary, so-called "alpha modes" of *Star Citizen* have been released.  *Id.* ¶ 7.  No part of *Squadron 42* has been released.  *Id.*  Both games remain in development.  *Id.*

### B.   The GLA

When CIG began to develop the games, it elected to use Crytek's CryEngine video game development platform.  *Id.* ¶ 8.  CIG and Crytek entered into the GLA.  *Id.*  It granted CIG a license to use CryEngine in the "Game," defined as including both *Star*

---

[4] *Simulnet E. Assocs. v. Ramada Hotel Operating Co.*, 37 F.3d 573, 576 (9th Cir. 1994).

*Citizen* and *Squadron 42*, in exchange for a license fee and flat royalty buy-out in the total amount of €1,850,000.00.  *Id.* Ex. 1.

### C. Lumberyard

In July 2014, Crytek granted Amazon a license that included "full, unencumbered access" to CryEngine, including the rights to rebrand and resell the technology to Amazon's customers.  Goldman Decl. Exs. 1, 7, 8.[5]  On February 9, 2016, Amazon announced that it would use CryEngine as the basis for a new engine called Lumberyard. *Id*. Amazon made Lumberyard, including full access to the source code, available for free to all Amazon Web Services customers.  *Id.*  By agreement dated as of April 30, 2016, Amazon granted CIG a license to use in *Star Citizen* and *Squadron 42* not only Lumberyard, but also the version of CryEngine that was embedded in the Game's source code.  Freyermuth Decl. ¶ 9.  On December 23, 2016, CIG publicly announced its switch from CryEngine to Lumberyard.  *Id.* Ex. 2.

### D. The Action Thus Far

#### 1. <u>Initial Complaint</u>

Crytek sued CIG without warning a year later, on December 12, 2017, alleging a kitchen sink of contractual and copyright claims.  Compl. [ECF 1].  Crytek contended that CIG's co-founder Ortwin Freyermuth, an attorney who previously represented Crytek on unrelated transactional matters, had engaged in a conflict of interest by negotiating the GLA on behalf of CIG back in 2012.  *Id*. ¶ 15.  CIG immediately sent Crytek a copy of a written conflict of interest waiver that Crytek had signed upon Mr. Freyermuth's request prior to his representing CIG in the negotiation of the GLA. Goldman Decl. ¶ 6.

---

[5] "Goldman Decl." means the concurrently-filed Declaration of Jeremy S. Goldman.

## 2. __First Amended Complaint__

After CIG alerted Crytek of its intent to file a Rule 11 motion for including the frivolous claim regarding Mr. Freyermuth, Crytek amended on January 2, 2018 by omitting these demonstrably false accusations. *Id.* ¶¶ 7-8, ECF 18.

CIG then moved to dismiss the First Amended Complaint. ECF 20. On August 14, 2018, the Court granted CIG's motion in part, dismissing Crytek's most expansive "exclusivity" claim that CIG breached GLA paragraph 2.1.2 by using a game engine other than CryEngine. ECF 38. The Court ruled that the plain language of the GLA did not support Crytek's claim that CIG was obligated to use only CryEngine to the exclusion of any other game engine. *Id.* at 8–11. The Court also dismissed Crytek's claim for punitive damages on contract and copyright claims as unavailable under the simplest black letter law. *Id.* at 20.

## 3. __Second Amended Complaint__

Crytek's Second Amended Complaint dated August 16, 2018 ("SAC") tried the same "exclusivity" tack under a different GLA paragraph, alleging that CIG breached GLA paragraph 2.4, which prohibits CIG from engaging in a competing game engine business. SAC [ECF 39] ¶¶ 36–39. CIG moved again to dismiss Crytek's second "exclusivity" theory as unsupported by the alleged facts and the GLA's plain language. ECF 42. On December 6, 2018 the Court granted CIG's motion giving Crytek one final shot to amend. ECF 49. On January 16, 2019, Crytek notified the Court that it would not amend. ECF 52.

## E. __What Remains in this Action__

The remaining operative claims in the SAC allege that CIG breached the GLA and infringed Crytek's copyright in CryEngine by: (1) using CryEngine in *Squadron 42* without permission; (2) removing Crytek's copyright and trademark notices from *Star Citizen*; (3) failing to deliver to Crytek certain "bug fixes and optimizations"; and (4) disclosing CryEngine source code in a series of online videos and to a third-party

1    developer.  *See* SAC ¶¶ 19–35, 40–52.  CIG answered the SAC on February 6, 2019,
2    denying each claim.  ECF 53.

3    **III.   ARGUMENT**

4           **A.    Foreign corporations suing in California may be ordered to post a**
5                  **security bond when there is a "reasonable possibility" the defendant will**
6                  **be entitled to its costs and fees.**

7           The Ninth Circuit has confirmed that "federal district courts have the inherent
8    power to require plaintiffs to post security for costs."  *Simulnet*, 37 F.3d at 574.  In
9    exercising this authority, district courts apply the law of the forum state.  *Id.*

10          California law empowers courts to require an undertaking "to secure an award of
11   costs and attorneys' fees" if:  (1) "the plaintiff resides out of state or is a foreign
12   corporation"; and, (2) "there is a reasonable possibility that the moving defendant will
13   obtain judgment in the action."  Cal. Civ. Proc. Code § 1030.  The purpose of this statute
14   is to "enable a California resident sued by an out-of-state resident to secure costs in light
15   of the difficulty of enforcing a judgment for costs against a person who is not within the
16   court's jurisdiction."  *AF Holdings, LLC v. Magsumbol*, No. 12 Civ. 4221, 2013 WL
17   12149267, at *1 (N.D. Cal. May 30, 2013) (citations omitted, dismissing case after
18   foreign copyright plaintiff failed to post court-ordered bond pursuant to CCP § 1030); *see*
19   *also Interlabservice, OOO v. Illumina, Inc.*, No. 15 Civ. 2171, 2016 WL 5817062, at *1
20   (S.D. Cal. October 3, 2016) (granting § 1030 bond motion against Russian LLC plaintiff.)

21          The "reasonable possibility" standard is "relatively low."  *Navasca*, 2013 WL
22   450383, at *1; *Pittman ex rel. L.P. v. Avish P'ship*, 525 F. App'x 591, 593 (9th Cir. 2013)
23   (affirming order requiring out-of-state plaintiff to post bond "because it was not illogical,
24   implausible, or without support in the record to conclude that there was a reasonable
25   possibility that Defendants would prevail").  A defendant need only "produce sufficient
26   evidence to demonstrate he has a 'reasonable possibility' of defeating each of plaintiff's
27   claims, but no more."  *Code Rebel, LLC v. Aqua Connect, Inc.*, No. 13 Civ. 4539, 2014
28   WL 2890242, at *3 (C.D. Cal. June 24, 2014) (granting § 1030 motion for bond against

Hawaiian plaintiff).  "A defendant is not required to show that there is no possibility that a plaintiff could win at trial, but only that it is ***reasonably possible*** that the defendant would win."  *Id.* (emphasis in original).[6]

In determining whether to order an undertaking, courts consider:  "(i) the degree of probability/improbability of success on the merits, and the background and purpose of the suit; (ii) the reasonable extent of the security to be posted, if any, viewed from the defendant's perspective; and (iii) the reasonable extent of the security to be posted, if any, viewed from the nondomiciliary plaintiff's perspective."  *Simulnet*, 37 F.3d at 573 (citations omitted).  Another key factor is whether red flags indicate a risk that the plaintiff will be unable to pay the award at the conclusion of the case.  *Gabriel Techs. Corp. v. Qualcomm Inc.*, No. 08 Civ. 1992, 2010 WL 3718848, at *14 (S.D. Cal. Sept. 20, 2010) ("Gabriel has waged a significant litigation against Qualcomm, and the purpose of section 1030 is to protect defendants like Qualcomm from being unable to collect judgments against out-of-state plaintiffs like Gabriel.  Gabriel's near insolvency demonstrates the importance of a bond to protect Defendants.").

Applying these principles, federal and state courts have routinely ordered security bonds.  *Kourtis v. Cameron*, 358 F. App'x 863 (9th Cir. 2009) (affirming order requiring copyright owners to post bond under federal and California law where plaintiffs resided out of state and there was reasonable possibility that film producer would prevail against infringement claims); *Code Rebel,* 2014 WL 2890242 (ordering out-of-state plaintiff to post bond under § CCP 1030); *Interlabservice,* 2016 WL 5817062 (same); *Gabriel*, 2010 WL 3718848 (same);  *AF Holdings LLC v. Trinh*, No. 12 Civ. 2393 (N.D. Cal. Nov. 9, 2012) (same); *Magsumbol*, 2013 WL 12149267 (same); *Navasca*, 2013 WL 450383

---

[6] Section 1030 requires the moving party to present "the best evidence available" to divine the possible outcome of the trial. *Shannon v. Sims Service Center, Inc.*, 164 Cal. App. 3d 907, 914 (1985). As the parties have not yet conducted discovery in this case, CIG's "best available evidence" regarding Crytek is based primarily on financial reports publicly filed by Crytek and media reports and press releases by and about Crytek.  Any issues regarding admissibility or hearsay will be remedied through discovery.

(same); and *Baltayan v. Estate of Getemyan*, 90 Cal. App. 4th 1427, 1432, 110 Cal. Rptr. 2d 72, 76 (2001) (lower court properly ordered nonresident to file bond where standard under CCP § 1030 did ***not*** require resident defendants "to show that there was no possibility that [nonresident] could win at trial, but only that it was ***reasonably possible*** that [residents] would win") (emphasis in original).

### B.    Crytek is a foreign (German) corporation.

The bond applies to plaintiffs who reside outside of California or are foreign corporations.  Cal. Civ. Proc. Code § 1030(a).  Crytek pleads it is a German corporation with its principal place of business in Frankfurt, Germany.  SAC ¶ 6.  This element of section 1030(b) is satisfied without dispute.

### C.    Crytek reeks of chronic financial decline.

Crytek's known and reported financial problems are breathtaking:  precipitously declining revenues, increased debt obligations, studio closures, asset divestitures, non-payment of employee salaries, mass employee exoduses and, soon after filing this suit, the replacement of the company's CEO.  Absent a substantial security bond, it appears disturbingly likely that when CIG prevails in this action, Crytek will leave CIG holding the bag for millions.

In 2014, reports erupted that Crytek was in serious financial trouble and on the "verge of bankruptcy."  Goldman Decl. Ex. 2.  Although Crytek initially denied the reports, its CEO soon admitted that Crytek indeed had been forced to withhold employee salaries to "salvage the company."  *Id.*, Ex. 3.  Crytek's then-nine studios witnessed an exodus of employees, including more than 30 from Crytek's studio in the United Kingdom and the leadership of Crytek's studio in Austin, Texas.  *Id.*, Exs. 4, 5.  Crytek managed to avert total disaster, at least temporarily, by massively downsizing its Austin studio (*id.*, Ex. 3), selling off a significant game title (*Homefront*) and its associated studio in the UK (*id.*, Ex. 6), and selling "full, unencumbered access" to CryEngine to Amazon (*id.,*  Ex. 1).

The Amazon deal brought Crytek a much-needed infusion of cash in a "high double-digit million amount," paid in installments between July 2014 and November 2015.  Goldman Decl, Exs. 7, 8.  But the relief was short lived.  Crytek quickly burned through the cash and its income could not keep up with the company's expenses.  In 2014, Crytek's revenue was down almost €6M from the prior year.  *Id.*  In 2015, **Crytek's revenue decreased another €43.2M** (from €69.4M to €26.1M), a staggering **62.3% drop**, culminating in an annual net loss of nearly €8M.  *Id.,* Exs. 9, 10.  Crytek was forced to borrow more than €5.25M from the bank, pushing its bank debt to almost €7M.  *Id.*

Although Crytek's revenue increased slightly in 2016, it was not enough to bring the company into operating profit.  *Id.*, Exs. 11, 12.  The company took out more than €5.6M in additional bank loans.  *Id.*  Crytek was forced to increase its trade payables by more than €3.3M through the use of "extended payment terms," demonstrating that Crytek was unable to meet its existing payment obligations on a current basis.  *Id.*  Crytek also borrowed an additional €3.2M through "shareholder loans."  *Id.*  After reports began to surface that Crytek was once again withholding employee salaries (*id.*, Ex. 13), the company announced it was shuttering five studios (*id.*, Ex. 14).

Crytek has not yet filed a financial report for 2017 or 2018.[7]  However, signs of Crytek's financial troubles persist.  In March 2017, Crytek announced the sale of its Bulgarian studio, leaving Crytek only two studios (Germany and Ukraine) in its portfolio.  *Id.*, Ex. 15.  In October 2017, Crytek signed a "substantial debt financing agreement in the low to mid-double digit Euro million range" with an undisclosed "European fund," plunging the already highly-leveraged company even further into debt.  *Id.*, Exs. 11, 12.

In February 2018, Crytek announced that its longtime CEO Cevat Yerli had stepped down, leaving it up to his two brothers to turn things around.  *Id.*, Ex. 16.  Crytek

---

[7] As a German company, Crytek is required to file in Germany publicly-available financial reports annually, with each annual report due thirteen months after the close of the company's financial year.  German Commercial Code § 325 (1a).  It appears Crytek missed the January 30, 2019 deadline to file its 2017 annual report.

---

reported that it would continue to focus on CryEngine and its games *Hunt: Showdown* and *Warface*. *Id.* But there are red flags on each of these endeavors. In 2016, Crytek reported a paltry €1.2M in revenue from CryEngine, down from €48.8M in 2014 and €7.8M in 2015. *Id.*, Exs. 7, 8, 9, 10, 11, 12. The precipitous decline is attributable, at least in part, to Crytek's sale of its CryEngine source code to Amazon, which rebranded the engine as Lumberyard and began offering it for free to customers of Amazon Web Services. *Id.*, Ex. 1. Crytek released its highly-anticipated game *Hunt: Showdown* in February 2018, but within a year, the game's peak monthly user base plummeted from a high of 14,003 (August 2018) to under 3,065 (January 2019), leading analysts to wonder whether the game was already dying. *Id.*, Ex. 17. Finally, in February 2019, the company reported that the team and Ukrainian studio behind *Warface*—Crytek's third supposed "focus"—had exited Crytek. *Id.*, Ex. 18.

In its announcement about the loss of *Warface*, Crytek suggested that this "reorganization" would allow the company "to focus on [its] own core IPs and long-term plans." *Id.* In light of Crytek's multiple studio closures, massive divestitures, shrinking game engine business, and underwhelming performance with *Hunt*, it is unclear what the "core IPs and long-term plans" are. Crytek's clouded future leaves CIG alarmed about Crytek's ability to pay CIG's costs and fees for claims already dismissed by the Court, let alone the remaining dubious claims.

If Crytek claims it has the financial wherewithal to cover such an award, it could not possibly suffer prejudice by posting an undertaking by paying some fraction of the requested award to an appropriate bond company.

### D.   The GLA and the Copyright Act provide for fee-shifting.

There are two bases for an award of costs and fees in this action. The GLA entitles the "prevailing party" to recover "all reasonable costs, attorneys' fees and other expenses reasonably incurred by such prevailing party in the litigation." GLA ¶10.8. Independently, the Copyright Act empowers the Court to "allow the recovery of full

costs" and "a reasonable attorney's fee to the prevailing party as part of the costs."  17 U.S.C. § 505.[8]

Even in the unlikely event that Crytek manages to squeak out some technical breach by CIG on one of Crytek's surviving claims, CIG is still very likely to be declared the prevailing party.  CIG already defeated Crytek's "exclusivity" claims, which were the only two claims pointed at CIG's overall use of the game engine in developing the games.  Crytek's remaining claims point at fragments and trivialities.  Only the "*Squadron 42* is unlicensed" claim is, at least theoretically, not *de minimis* on its face. The problems with the *Squadron 42* claim include the simple facts that the **GLA expressly licenses CIG to use CryEngine to develop Squadron 42** and **CIG has not released Squadron 42**.  The other remaining claims (bug fixes, credits, and the alleged disclosure of Crytek's source code) are facially about next to nothing.  Although these claims are meritless, they are also so immaterial that CIG will still likely be declared the prevailing party even if Crytek attains a pyrrhic victory on one or more of them.  Cal. Civ. Code § 1717(b)(1) (one party may still be deemed the "prevailing party" if it "recovered a greater relief in the contract").

### E.     CIG has already prevailed against Crytek's broadest claims.

CIG has already prevailed over not just the sweeping, groundless Crytek "exclusivity" claims, but also other irresponsible allegations.  Crytek's initial complaint alleged that CIG's co-founder was conflicted; Crytek grudgingly walked back that claim after CIG produced the written conflict waiver signed by Crytek.  Crytek sought punitive damages on its breach of contract and copyright claims; the Court unsurprisingly threw

---

[8] Since Crytek's copyright and contract claims "involve[d] a common core of facts and related legal theories," the Court may award CIG its costs and fees under GLA paragraph 10.8 without having to invoke section 505 of the Copyright Act.  *Unicom Systems, Inc. v. Farmers Group, Inc.,* 405 Fed.Appx. 152, 155 (9th Cir. 2010) (upholding attorneys' fee awarded to plaintiff under both copyright and breach of contract without apportionment); *Reynolds Metals Co. v. Alperson*, 25 Cal. 3d 124, 129–30 (1979) (holding that court need not apportion fees where they are "incurred for representation on an issue common to both a cause of action in which fees are proper and one in which they are not allowed).

out that claim.  Crytek twice threw up prayers that the GLA prohibits CIG from using another game engine.  The Court dismissed Crytek's first claim—that  the GLA shackles CIG to CryEngine—as unsupported by the plain language of the GLA and anathema to the central purpose of a license.  The Court dismissed Crytek's second claim—that CIG was engaging in a competing game engine business—as bereft of factual support.  These wins on claims and allegations that never should have been made, including attacks aimed at the heart of the GLA, leave only a rump set of quibbles that attack peripheral matters.

### F.    CIG will prevail on Crytek's remaining claims.

***Squadron 42.***  Crytek's contractual and copyright claims related to *Squadron 42* fail for the simple yet dispositive reason that the GLA contains a broad right for CIG to develop, market and sell *Squadron 42* however CIG wishes as long as the game is accessed through the *Star Citizen* game client.  Since ***Squadron 42 has not been released***, CIG is not in breach of the GLA.

The GLA acknowledges CIG's right to "use, copy, reproduce or duplicate, in any manner or form, in whole or in part CryEngine (or any part thereof) . . . as necessary to exercise [CIG]'s right under the license."  GLA ¶ 2.2.3.  The primary "right" for CIG "to exercise" under the GLA is CIG's right to "embed CryEngine in the ***Game*** and develop the ***Game***[.]"  *Id.* § 2.1.2.  Critically, and completely absent from Crytek's SAC, is the fact that the GLA defines the "Game" as Star Citizen "***and its related space fighter game 'Squadron 42.'***"  GLA at 2 and Ex. 2 ("Squadron 42" and "Star Citizen" are features of the "Game").  Thus, the GLA expressly authorizes CIG to use and copy CryEngine, "in any manner or form," for the purpose of developing *Squadron 42*.[9]  Any argument by Crytek that CIG's use of CryEngine to ***develop*** *Squadron 42* must therefore fail.

_____

[9] Given this language and the absence of any contrary restriction, the GLA is not reasonably susceptible to an interpretation that would prohibit CIG from using a separate instance of CryEngine to develop *Squadron 42* in a separate code base.  In any event, CIG maintains the source code for *Squadron 42* in the same code base as *Star Citizen*.  Freyermuth Decl. ¶ 7.

Crytek complains about CIG's marketing and pre-selling of *Squadron 42* as a standalone unit. SAC ¶¶ 19–25, 56. However, the GLA expressly authorizes CIG to "market, promote, sell, license, publish and exploit the Game ***in any way***[.]" GLA ¶ 2.1.3 (emphasis added). Thus, CIG's activities did not breach the GLA. CIG's marketing and pre-selling of *Squadron 42* also did not infringe Crytek's copyright in CryEngine because neither of those activities are "grounded in an exclusive right of copyright." *MDY Indus., LLC v. Blizzard Entm't, Inc.*, 629 F.3d 928, 941 (9th Cir. 2010) (holding that players' unauthorized use of bots in video game did not constitute copyright infringement as a matter of law because the activities did not implicate any of the copyright owner's exclusive statutory rights under 17 U.S.C. § 106).

Contrary to Crytek's contention, the language in Exhibit 2 to the GLA does not change this conclusion. Exhibit 2 to the GLA prohibits CIG from selling or marketing *Squadron 42* as a separate unit ***only if players can actually access the standalone game***. Exhibit 2 to the GLA provides:

> For the avoidance of doubt, the Game does not include any content being sold and marketed separately ***<u>and</u> not being accessed through the Star Citizen Game client*,**[10] e.g. a fleet battle RTS sold and marketed as a separate standalone PC game that does not interact with the main Star Citizen game (as opposed to an add-on / DLC to the Game).

GLA (at Ex. 2; emphasis added). CIG cannot possibly have breached the GLA because players ***have not been able to access Squadron 42 at all***—either outside the *Star Citizen* game client or within the *Star Citizen* game client. Freyermuth Decl. ¶ 7. The game has simply not been released. *Id.* Put in contract terms, the "time for performance" has not yet arrived. *Taylor v. Johnston*, 15 Cal. 3d 130, 137 (1975) ("There can be no actual breach of a contract until the time specified therein for performance has arrived."). When CIG does release *Squadron 42*, the game engine source code will be licensed under

---

[10] "Game client" is a term in the videogame business that means the portal through which a player accesses the video game. *See* Wikipedia, "game client," at https://en.wikipedia.org/wiki/Game_client.

CIG's separate agreement with Amazon, not Crytek.  Freyermuth Dec. ¶ 7.  Since Crytek's code will no longer be in use, the restrictions in Exhibit 2 have no application to that future release.

To the extent that the method by which CIG **intended** to release *Squadron 42* somehow factors into whether CIG violated the restriction in Exhibit 2, the evidence shows that CIG's intention during the relevant time period[11] was to make *Squadron 42* available only through the *Star Citizen* game client strictly in accordance with the GLA. On January 29, 2016, CIG made a public announcement suggesting that *Squadron 42* would be available "as either a stand alone game or an optional addon for *Star Citizen* rather than be included by default." *Id.*, Ex. 3.  During a February 5, 2016 phone call, Mr. Freyermuth clarified to Crytek's counsel that CIG still planned to make *Squadron 42* available only through the *Star Citizen* game client. *Id.* ¶ 12.  Crytek's counsel confirmed that the GLA allows CIG to sell a module like *Squadron 42* separately as long as players could access the module only through the *Star Citizen* game client — which accorded with CIG's right under the GLA to sell and market *Squadron 42* "in any way." *Id.*; GLA § 2.1.3.  On February 7, 2016, Mr. Freyermuth sent an email to Crytek's counsel memorializing their telephone conversation and stating that CIG would publish a corrective statement to clarify that *Squadron 42* would remain functionally tied to *Star Citizen* and only accessible through the *Star Citizen* game client.  *Id.*, Ex. 4.  On February 8, 2016, CIG made that announcement, clarifying that *Star Citizen* and *Squadron 42* would still be "functionally connected," would continue to be accessed "though the same game client," and that "performance in Squadron 42 [would] still have an impact on [players'] career[s] in [Star Citizen]."  *Id.*, Ex. 5.  Crytek did not raise any further objections and CIG considered the matter closed until Crytek filed this lawsuit almost two years later.  *Id.* ¶ 15.

---

[11] The relevant time period is between February 14, 2016, when CIG began pre-selling *Squadron 42*, and April 30, 2016, the effective date of CIG's license agreement with Amazon.  Freyermuth Dec. ¶¶ 9, 14.

***Bug Fixes.***  CIG will prevail against Crytek's claim that CIG breached the GLA by failing to deliver bug fixes because ***CIG did in fact deliver the bug fixes.***[12]

The SAC alleges that, "[o]n November 16, ***2015***, Crytek requested long overdue bug fixes and optimizations from Defendants." SAC ¶ 42 (emphasis added).  In fact, this was Crytek's ***first*** demand for the bug fixes, and therefore the first time CIG was obligated to perform.[13]  Freyermuth Decl. Ex. 6.  CIG tendered delivery ***two weeks later***, but requested that Crytek first sign a "delivery notice" with confidentiality language.  *Id.*, Exs. 6, 7.  Crytek did not respond, much less object, to CIG's tender at that time.  *Id.* ¶ 18.  Thus, under California law,[14] Crytek "must be deemed to have waived" any objection it had to the tender.  Cal. Civ. Proc. Code § 2076; *Layton v. West*, 271 Cal. App. 2d 508, 511–12 (1969) (citing Cal. Civ. Code § 1501) (holding that offeree waives its objections to any extra-contractual conditions imposed by tender offeror "if he does not specifically point out the alleged defects in the tender . . . at that time").

On November 24, ***2016—over a year later***—Crytek by letter asserted that CIG was in breach of the GLA for failing to deliver the bug fixes requested in 2015 and demanded that CIG provide the bug fixes within 30 days.  Freyermuth Decl. Ex. 8.  In response, CIG re-tendered performance on November 30, 2016 stating that CIG was "always . . . ready and willing to make delivery" of the bug fixes so long as Crytek would first sign

---

[12] Crytek claims that CIG breached GLA paragraph 7.3, which states that "[a]nnually during the Game's development period, . . . [CIG] shall provide Crytek with any bug fixes, and optimizations made to the CryEngine's original source code files . . . as a complete compilable version."

[13] Since the GLA contains no "unconditional promise" by CIG to provide the bug fixes "at a fixed time" (it only says "annually"), *Drake v. Martin*, 30 Cal. App. 4th 984, 998–99 (1994), under California law, the GLA did not obligate CIG to deliver the bug fixes until it received Crytek's request.  *Leonard v. Rose*, 65 Cal. 2d 589, 592 (1967) ("Where no time is specified for performance, a person who has promised to do an act in the future and who has the ability to perform does not violate his agreement unless and until a demand for performance is made and performance is refused[.]").

[14] California law controls the GLA.  GLA ¶ 10.8.

the requested "delivery notice." *Id.*, Ex. 9. CIG reminded Crytek that Crytek failed to respond to CIG's December 2015 letter. *Id.* Crytek ***again*** did not object to CIG's tender. *Id.* ¶ 21. Rather, on December 2, 2016, Crytek ***acknowledged its failure to respond*** to CIG's December 2015 tender, ***withdrew*** its notice of default, and inquired if the terms of CIG's "delivery notice" were still valid. *Id.*, Ex. 10. Far from ***objecting*** to CIG's tender of performance, Crytek indicated that it intended to ***accept*** the tender. *Id*. Thus, Crytek again waived its right to object to CIG's tender in response to Crytek's November 24, 2016 demand.

***Six months later***, on June 22, ***2017***, Crytek attempted to reverse course completely, announcing for the first time it would not sign the requested "delivery notice" and demanding that CIG provide the bug fixes without condition. *Id.* Ex. 11. Because Crytek refused to confirm that it would maintain CIG's proprietary *non-engine* game code in confidence, CIG proceeded to undertake the complex task of separating its game code from the engine code and preparing it as a compilable version. *Id.* ¶ 24. Upon completion, on January 23, 2018, CIG delivered and Crytek accepted the bug fixes without condition. *Id.* ¶ 25, Ex. 12. It has heard nothing about them since. *Id.* ¶ 26.

This delivery constituted timely performance. Had Crytek not already permanently waived its objections by failing to timely object to CIG's prior tenders, Crytek's June 2017 request did not specify a particular date for performance and no such deadline appears in the GLA. *Id.*, Exs. 1, 11. Where, as here, a contractual duty cannot be performed instantly and "no time is specified for the performance of an act required to be performed, a reasonable time is allowed." Cal. Civ. Code § 1657; *see also Wagner Constr. Co. v. Pac. Mech. Corp.*, 41 Cal. 4th 19, 30 (2007) ("What constitutes a reasonable time is a question of fact, depending on the situation of the parties, the nature of the transaction, and the facts of the particular case.") (brackets omitted). Given task complexity, the fact that the GLA requires CIG to deliver the code only "annually," and that Crytek sat for a year only to respond in the most disinterested manner possible to CIG's original tender, CIG has at least a "reasonable possibility" of demonstrating that its

delivery of the code seven months after receiving Crytek's course-reverse request constitutes timely performance under the GLA, or that any objection as to timing has been waived.  *See, e.g.*, *Eidsmore v. RBB, Inc.*, 25 Cal. App. 4th 189, 198 (1994) (six months after contract's execution was a reasonable amount of time for delivery of a unique automobile).[15]

**_Crytek's Credits._**  Crytek's claim that CIG breached the GLA by removing its copyright and trademark notices from *Star Citizen* and related marketing materials fails because **_CIG is no longer using CryEngine in the Game._**  By December 23, 2016, which is when CIG removed the credits for CryEngine and replaced them with credits for Lumberyard, CIG had already entered into, and was developing the Game under, CIG's license agreement with Amazon.  Freyermuth Decl. ¶ 27.

"[S]tipulations which are necessary to make a contract reasonable, or conformable to usage, are implied, in respect to matters concerning which the contract manifests no contrary intention."  Cal. Civ. Code § 1655.  The contractual requirement that CIG display Crytek's notices in *Star Citizen* is not reasonable without the implied condition that CIG actually use CryEngine in the game.[16]  Otherwise, the GLA would require CIG to represent to consumers that CryEngine was a current building block of *Star Citizen* even when it was not, which would produce an absurd interpretation of the GLA at odds with California law.  *Id.* § 1638 ("The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity.").  Interpreting the GLA this way also would require CIG to engage in false and deceptive advertising, Cal. Bus. & Prof. Code § 17500 (making untrue or misleading statements

---

[15] As if to punctuate how this claim came out of mothballs and into the kitchen sink pleadings, Crytek articulates no theory or calculation of damages that it hopes to fasten to this claimed breach.

[16] In addition, the GLA "manifests no contrary intention":  the GLA does not state that the parties intended to require CIG to continue displaying Crytek's notices even if *Star Citizen* no longer used CryEngine.

concerning goods and/or services for sale is unlawful), and therefore is the wrong way to read the contract under California law.  *Id.* § 1643 ("A contract must receive such an interpretation as will make it lawful . . .  if it can be done without violating the intention of the parties.").

Independently, there is more than a "reasonable possibility" Crytek will be unable to carry its burden of proving the essential element of damages.  *Aguilera v. Pirelli Armstrong Tire Corp.*, 223 F.3d 1010, 1015 (9th Cir. 2000) ("Under California law, a breach of contract claim requires a showing of appreciable and actual damage.").  While Crytek now complains about the removal of the credits, in fact ***Crytek has been trying to disassociate*** itself from CIG ***for years***.  Freyermuth Decl. ¶ 29.  From 2013 through early 2015, before Crytek's financial problems caused a number of its employees to resign and join CIG, Crytek featured *Star Citizen* and CIG in its social media posts, promotional videos, and in the "Developer Showcase" videos that it exhibited at the annual Game Developers Conference, one of the gaming industry's biggest and most important trade shows.  Freyermuth Decl. ¶ 30; Goldman Decl. Exs. 19-27.  However, Crytek abruptly stopped doing so ***in 2015***, pointedly omitting *Star Citizen* from its annual "Developer Showcase" video that year and ceasing all its social media mentions of the game or CIG after January 22, 2015.  Freyermuth Decl. ¶ 31.  Crytek's claim that it suffered monetary damage from the loss of "promotional consideration" due to CIG's removal of notices crumbles into a heap of hypocrisy.

**_Bugsmashers._**  CIG will likely defeat Crytek's claim that CIG violated the GLA's confidentiality provision by displaying fragments of the CryEngine source code in a series of "Bugsmashers" videos[17] because Crytek will never prove the alleged breach caused it any damage.

---

[17] The Bugsmashers videos feature a CIG software engineer walking through how he addresses coding errors identified in the game.  Freyermuth Decl. ¶ 32.  The videos often show footage of the engineer's screen as he addresses bugs in the code.  *Id.*  Crytek has never identified which of its code is supposedly displayed in the Bugsmashers videos.

Crytek cannot be damaged by CIG's alleged display of fragments of source code that Crytek itself disclosed in its entirety to the public. *See Elmotec Statomat, Inc. v. Visteon Corp.*, No. 07-13884, 2009 WL 1034929, at *4 (E.D. Mich. Apr. 17, 2009) ("It is not clear to the court how Elmotec can reasonably claim the confidentiality agreement was breached if it made its own confidential information public. Further, Elmotec has not enumerated its damages."). In 2011, Crytek began making its CryEngine source code available to the public. Goldman Decl. Ex. 28. In August of that year, Crytek published a key component of its platform—a source code layer called CryAction—as part of a freely downloadable software development kit. *Id.* By February 2016, Amazon publicly released the source code for Lumberyard, which was virtually identical to the CryEngine source code. *Id.* Ex. 1. And then, in March 2016, Crytek released CryEngine under a "pay-what-you-want" license model that offered full source code access without requiring users to pay Crytek a cent in fees or royalties. *Id.,* Exs. 29, 30. While Crytek has yet to identify which videos supposedly display CryEngine code or which code supposedly appears, it is extremely likely that Crytek itself published any code snippets that appeared in "Bugsmashers."

Independently, Crytek is highly unlikely to prove that any of the code snippets carried independent utility. Freyermuth Decl. ¶ 33. This is because CryEngine is a massively complex computer program comprising millions of lines of interdependent code and thousands of files divided among many different modules that all need to work in tandem to accomplish the various tasks that make a modern video game work. *Id.* There is far more than a reasonable possibility that Crytek will be unable to show—as it must—a reasonable basis for computing the dollar amount of damages it suffered from the display of isolated lines of code from any one of these modules. *RCRV Inc. v. J L J Inc.*, No. 2:12-cv-07609-SVW-FMO, 2013 WL 12133691, at *10 (C.D. Cal. Jan. 30, 2013) (where there is no "reasonable basis of computation of damages," a breach of contract claim fails); *cf. Vault Corp. v. Quaid Software, Inc.*, 847 F.2d 255, 267–68 (5th

Cir. 1988) (use of 30 characters of source code taken from programs that were between 50 and 80 pages long was *de minimis* and non-actionable).

*Faceware.* Crytek's claim that CIG disclosed CryEngine source code to Faceware Technologies, Inc., a claim which Crytek based only on "information and belief," is simply false.  SAC ¶ 51; Freyermuth Decl. ¶¶ 34-35; Grenier Decl. ¶¶ 1-4.[18]  It never happened.  *Id.*

### G.   CIG's likelihood of prevailing is even stronger in light of Crytek's additional burden of proving that each of the alleged breaches was "intentional" pursuant to GLA paragraph 6.1.4.

Any possibility of Crytek prevailing on one or more of its claims is diminished by the extra burden imposed upon Crytek pursuant to GLA paragraph 6.1.4, which requires Crytek to demonstrate that each of CIG's alleged breaches was "intentional."  In the context of the GLA, the term "intentional" is reasonably interpreted to require more than CIG's "intentional non-performance" of its contractual obligations "motivated by financial self-interest."  *Metro. Life Ins. Co. v. Noble Lowndes Int'l, Inc.*, 643 N.E.2d 504, 508 (N.Y. 1994).

In *Metropolitan Life*, New York's Court of Appeals examined a contractual provision that exempted a software vendor from damages stemming from its "performance or nonperformance," with an exception "for intentional misrepresentations, or damages arising out of defendant's willful acts or gross negligence."  *Id.* at 505–06 (emphasis and brackets omitted).  The vendor argued that, in the context of breach of contract, a "willful act" required more than "deliberate or intentional nonperformance."  *Id.* at 506.  The buyer had to show that the vendor's "conduct was malicious, i.e., the intentional perpetration of a wrongful act injuring plaintiff without justification."  *Id.*

The court agreed, affirming the appellate division's modification of a post-trial judgment for the buyer.  Though recognizing that intentions are generally irrelevant in

---

[18] "Grenier Decl." means the concurrently-filed Declaration of Jay Grenier, the Director of Product Development at Faceware Technologies, Inc.

breach of contract cases, the court held that "[i]n excepting willful acts from defendant's general immunity from liability for consequential damages . . .  the parties intended to narrowly exclude from protection truly culpable, harmful conduct, not merely intentional nonperformance of the Agreement motivated by financial self-interest."  *Id.* at 507, 508. The court concluded that "the term willful acts as used in this contract was intended by the parties to subsume conduct which is tortious in nature, i.e., wrongful conduct in which defendant willfully intends to inflict harm on plaintiff at least in part through the means of breaching the contract between the parties."  *Id.* at 508.  Because the vendor's breach "was motivated exclusively by its own economic self-interest" and not a desire to harm the buyer, it did not trigger the agreement's carve-out for "willful acts."  *Id.* at 509.

The GLA's exculpatory clause is almost identical to the clause at issue in *Metropolitan Life.  Compare* GLA paragraph 6.1.4 (eliminating both parties' liability to each other in all contract, tort, or other actions "except for intentional acts or omissions or gross negligent acts"), *with Metro. Life*, 643 N.E.2d at 505–06 (eliminating defendant's liability for "loss of profit, loss of business, or other financial loss" resulting from its performance or nonperformance of the agreement except in cases "of intentional misrepresentations, or damages arising out of defendant's willful acts or gross negligence") (emphasis and alterations omitted).  The sound reasoning of New York's highest court applies equally here.  Like the parties in *Metropolitan Life*, CIG and Crytek intended to exclude from liability breaches that were merely deliberate and resulted from economic self-interest.  643 N.E.2d at 508.  To fall outside paragraph 6.1.4's general liability waiver, the GLA is reasonably interpreted to require Crytek to prove that CIG "intend[ed] to inflict harm on [Crytek] at least in part through the means of breaching" the GLA.  *Id.* at 509.  Based on the allegations of the SAC and the actual facts and circumstances related to CIG's alleged breaches of the GLA, there is more than a reasonable possibility that Crytek will be unable to establish that CIG possessed the necessary culpability to recover any damages, even if Crytek managed to prove some kind of technical breach by CIG on one or more of its claims.  *See Lewis v. YouTube,*

*LLC*, 244 Cal. App. 4th 118, 125 (2015) (breach of contract claim failed where liability waiver eliminated the possibility of damages).

**H.   The amount of the bond requested by CIG is reasonable from the viewpoints of both parties.**

CIG requests that the Court order Crytek to deposit an amount of $2,193,298.45 to secure CIG's award of costs and attorney's fees. This amount at best reasonably estimates the costs and attorneys' fees CIG may be forced to incur in this litigation, and runs the risk of significantly underestimating the actual expense. The accompanying Declaration of Jeremy S. Goldman details the amount already spent and itemizes CIG's projected attorneys' fees and expenses going forward. Several factors suggest the potential for significant defense costs. *See* Goldman Decl. ¶¶ 33-36 and Exs. 31-37.

***First***, the claims related to *Squadron 42*, the bug fixes, and the Bugsmashers videos likely will require source code analysis by expert software engineers. Freyermuth Decl. ¶ 37. The source code for CryEngine, *Star Citizen*/*Squadron 42*, and Amazon Lumberyard comprises thousands of files and millions of lines of code. *Id.* ¶ 36. The expert fees and legal fees related to source code analysis will be substantial.

***Second***, Crytek's discovery requests and initial disclosures portend a scorched earth approach to this lawsuit by Crytek and its counsel. Crytek's requests for production sought virtually every document in CIG's possession, custody or control. Goldman Decl. Ex. 31. Crytek's initial disclosures identified 15 employees of CIG believed to have relevant information. *Id.*, Ex. 32. While Magistrate Judge Mumm recognized that many of Crytek's document requests were patently overbroad,[19] and the Court is unlikely to

---

[19] *See* Goldman Decl. Ex. 33 (transcript of April 17, 2018 hearing before Magistrate Judge Frederick F. Mumm on CIG's motion for a protective order controlling the timing and scope of discovery) at 8 ("I guess the larger problem here is . . . the breadth of the discovery request. . . . I will indicate that it appears to the Court that many of the requests – I can't conceive for instance why crowdfunding would be discoverable. . . . So there -- there is a lot in there that I would not expect the defendant would be required to respond to.").

permit Crytek to depose 15 people, CIG predicts costly and time-consuming discovery and discovery battles ahead.

*Third*, Crytek's counsel in this case have a track record of accumulating breathtaking fees in litigation involving alleged software copyright infringement.  In *Zenimax Media Inc. v. Oculus VR LLC*, a Skadden team including Messrs.  Sammi, Hemr, and Pak (all counsel of record here) sought an attorneys' fee award of ***$40 million***.  Goldman Decl. Ex. 34.  CIG very much deserves to be protected from having to chase a financially unhealthy foreign corporation for even a fraction of such a staggering amount.

*Finally*, Crytek seems fixated on the $200 million-plus in crowdfunding raised by CIG.  SAC ¶¶ 27, 56, 70; *see also infra* note [19].  That legally unmoored fixation on CIG's crowdfunding, plus Crytek's desperate thirst for cash, never mind the merits, both unfortunately virtually guarantee expensive litigation and activates jaundiced eye examination of the "purpose of the suit" consideration referenced by the Ninth Circuit.  *See Simulnet*, 37 F.3d at 573 (directing courts to consider "background and purpose of the suit" when determining whether to order security bond).

///

///

## IV. CONCLUSION

For the foregoing reasons, CIG respectfully requests that the Court grant its motion and require Crytek to post a bond pursuant to Cal. Civ. Proc. Code § 1030 in the amount of $2,193,298.45.

Dated:  March 29, 2019                    Respectfully submitted,

FRANKFURT KURNIT KLEIN & SELZ, P.C.

BY:  */s/ Jeremy S. Goldman*
     Joseph R. Taylor (SBN 129933)
     Jeremy S. Goldman (SBN 306943)
     Azita Iskandar (SBN 280749)
     2029 Century Park East, Suite 1060
     Los Angeles, CA 90067
     Telephone:  (310) 579-9600
     Facsimile:  (310) 579-9650
     E-mail:   jtaylor@fkks.com
             jgoldman@fkks.com
             aiskandar@fkks.com

Attorneys for Defendants CLOUD IMPERIUM GAMES CORP. and ROBERT SPACE INDUSTRIES CORP.