Eric A. Buresh (*pro hac vice*)
eric.buresh@eriseip.com
Clifford T. Brazen (*pro hac vice*)
cliff.brazen@eriseip.com
Chris R. Schmidt
chris.schmidt@eriseip.com
Erise IP, P.A.
7015 College Blvd.
Suite 700
Overland Park, KS 66211
Phone: (913) 777-5600
Facsimile: (913) 777-5601

Ben M. Davidson (Cal. Bar. No. 181464)
ben@dlgla.com
Davidson Law Group, a Law Corporation
4500 Park Granada Boulevard, Suite 202
Calabasas, CA 91302
Telephone: (818) 918-4622
Facsimile: (310) 473-2941

Attorneys for Plaintiff Crytek GmbH

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| CRYTEK GMBH,<br><br>    Plaintiff,<br><br>v.<br><br>CLOUD IMPERIUM GAMES CORP. and ROBERTS SPACE INDUSTRIES CORP.,<br><br>    Defendants. | Case No. 2:17-cv-08937-DMG-FFM<br><br>[HON. DOLLY M. GEE]<br><br>**CRYTEK GMBH'S RESPONSE TO DEFENDANTS' MOTION FOR BOND**<br><br>Date: June 28, 2019<br>Time: 9:30 AM<br>Courtroom: 8C |

# TABLE OF CONTENTS

I.   INTRODUCTION ................................................................................................1

II.  CIG HAS NOT ADDRESSED THE NECESSARY QUESTIONS TO MEET ITS BURDEN ..........................................................................................2

III. CIG'S ASSESSMENT OF THE MERITS IS BOTH WRONG AND SUPERFICIAL ...................................................................................................3

    A.   CIG Remains Bound by the GLA Despite its License with Amazon ....................................................................................................3

    B.   Crytek's Claims Are Meritorious and Commercially Meaningful .......4

IV.  CIG'S BOND REQUEST IS EXCESSIVE .....................................................10

V.   CONCLUSION ................................................................................................13

# TABLE OF AUTHORITIES

**Cases**

*Headlands Reserve, LLC v. Ctr. For Natural Lands Mgmt.*, No. SACV 07-00203-CJC(AJWx), 2008 WL 11342747 (C.D. Cal. Apr. 9, 2008) ................ 2

*Tire Hanger Corp. v. Rotary Lift*, No. EDCV 15-2348 JGB (SPx), 2019 WL 1091334 (C.D. Cal. Jan. 14, 2019) ................................................................ 2

**Statutes**

Cal. Civ. Proc. Code § 1030 ......................................................................... 2

Cal. Civ. Proc. Code § 1717(b)(1) ............................................................... 2

Cal. Civ. Proc. Code § 1033.5(b)(1) ........................................................... 11

## I. INTRODUCTION

CIG's motion for bond is built on a series of fictions. While CIG may hope that Crytek is "teetering on the brink of insolvency," the reports of Crytek's demise are greatly exaggerated. While CIG may wish that there is no remedy for Crytek in this action, CIG knows full well that equitable specific performance of the terms of the GLA contract are just as commercially important to Crytek (and just as undesirable to CIG) as monetary relief. While CIG may yearn to stop using the CryEngine in order to avoid the requirements of the GLA, it did not do so. In fact, CIG's bond motion is inextricably entwined with its contention that it "switched" from the CryEngine to the Lumberyard Engine. Yet, CIG's own nuanced statements indicate that CIG did not actually *replace* the CryEngine code embedded in the game with the Lumberyard Engine code. Instead, the "switch" suggested by CIG was nothing more than CIG electing to enter a new license agreement with Amazon whereby CIG apparently licensed the CryEngine—for a second time. CIG's apparent decision to take a second license does not render its agreement with Crytek null and void. At least as long as CIG is using the CryEngine code, it is bound by the terms of the GLA whether it calls the code the CryEngine or the Lumberyard Engine. This thread that underlies many of CIG's arguments, once pulled, will unravel CIG's premature claims of victory and will lead to Crytek meeting many if not all of its objectives in this litigation. Ultimately, to be entitled to a bond, CIG must establish that it has a reasonable possibility of being found the "prevailing party" in view of Crytek's multiple claims of breach of the GLA. In cases such as this, prevailing party status comes down to which party accomplishes its main litigation objectives. This is a highly discretionary, highly fact-intensive inquiry that CIG does not even attempt to support in its brief. CIG pays no mind to whether Crytek is likely to obtain its main litigation objectives. Nor does CIG's motion reflect any attempt even to understand what those objectives might be. CIG does not address the necessary questions, and CIG has not met its burden of demonstrating entitlement to any bond.

## II. CIG HAS NOT ADDRESSED THE NECESSARY QUESTIONS TO MEET ITS BURDEN

California Code of Civil Procedure § 1030 provides that a defendant may move to require the plaintiff to post a bond where "the plaintiff resides out of the state or is a foreign corporation and [] there is a reasonable possibility that the moving defendant will obtain judgment in the action or special proceeding." Cal. Civ. Proc. Code § 1030. Here, CIG posits that it will be entitled, under paragraph 10.8 of the GLA, to an award (i.e., judgment) of attorneys' fees and costs. Paragraph 10.8 limits such awards only to a prevailing party. CIG suggests that if it prevails on some claims or if Crytek is not awarded a large monetary award, then CIG is a prevailing party. This is not how a prevailing party is defined in cases such as this, and CIG has done virtually none of the analysis that would be required to show even a reasonable possibility of who will be a prevailing party in this action, if anyone.

The prevailing party in a contract matter "is 'the party who recovered a greater relief in the action on the contract.'" *See* Cal. Civ. Proc. Code § 1717(b)(1). "When dealing with a contract case with multiple claims, 'if neither party achieves a complete victory on all of the contract claims, it is within the discretion of the trial court to determine which party prevailed on the contract, or whether, on balance, neither party prevailed sufficiently to justify an award of fees." *Headlands Reserve, LLC v. Ctr. For Natural Lands Mgmt.*, No. SACV 07-00203-CJC(AJWx), 2008 WL 11342747 at *2 (C.D. Cal. Apr. 9, 2008).

The determination is ***fact-intensive***: "'the trial court is to compare the relief awarded on the contract claim or claims with the parties' demands on those same claims and their litigation objectives as disclosed by the pleadings, trial briefs, opening statements, and similar sources.'" *Tire Hanger Corp. v. Rotary Lift*, No. EDCV 15-2347 JGB (SPx), 2019 WL 1091334 at *4 (C.D. Cal. Jan. 14, 2019) (quoting *Hsu v. Abbara*, 9 Cal. 4th 863, 875-76 (1995)). And even where the plaintiff is denied direct relief, the "court may still find a party prevailed . . . if it is clear that the party has

CRYTEK'S RESPONSE TO DEFENDANTS' MOTION FOR BOND

2

otherwise achieved its main litigation objective." *Id*. Finally, "[t]he court may consider 'earlier payments, settlements, insurance proceeds or other recovery' in addition to the monetary judgment." *Id*.

CIG provides none of this analysis. It has not considered or discussed the actual relief sought by Crytek. It has not even attempted to identify or discuss Crytek's litigation objectives and Crytek's chances of achieving those objectives. It has not considered the impact of other relevant facts, such as the fact that Crytek has already secured CIG's delivery of its bug fixes as a result of this lawsuit. On the record presented by CIG, the Court is simply not armed to determine whether it is a reasonable possibility that anyone will be a prevailing party after the Court exercises its discretion in line with the considerations noted above. CIG has not provided sufficient information on which this Court could actually make that determination. CIG has failed to address the relevant inquiries or to present evidence by which the Court could make a reasonable prediction, and its motion should be denied.

### III. CIG'S ASSESSMENT OF THE MERITS IS BOTH WRONG AND SUPERFICIAL.

While CIG's approach cannot support a fair assessment regarding who will be the prevailing party in this action, CIG's explication of the merits and potential remedies suffers from serious deficiencies that cast a further pall on its efforts to show entitlement to a bond.

#### A. CIG Remains Bound by the GLA Despite its License with Amazon

As an initial matter, there appears to be a significant disconnect between the declaration evidence CIG submitted in support of its motion, and the arguments made in the motion itself. As CIG acknowledges, it developed *Star Citizen* and *Squadron 42* using Crytek's CryEngine video game development platform. Dkt. 57-2 (Freyermuth Declaration), at ¶ 7-8. It did so under the terms of the GLA dated November 20, 2012. *Id*. On April 30, 2016, CIG obtained another license to the CryEngine embedded in *Star Citizen* from Amazon in addition to rights to an Amazon

CRYTEK'S RESPONSE TO DEFENDANTS' MOTION FOR BOND
3

game engine known as Lumberyard. *Id.* at 9.

In its brief, CIG describes taking this second license as a "switch" to the Lumberyard engine. Dkt. 57-1, at 3. CIG further argues in its brief that "Crytek's code will no longer be in use." *Id.* at 13. In contrast, Mr. Freyermuth's actual declaration statements do not say any such thing: "Amazon granted CIG a license to use in *Star Citizen* and *Squadron 42* not only Lumberyard, **but also the version of CryEngine that was then embedded in the games' source code**. Following execution of the Amazon license, CIG began developing the games under the Amazon license. When CIG releases *Squadron 42* to the public, the game engine source code will be licensed under this Amazon agreement, not the GLA." Dkt. 57-2, at ¶ 9 (emphasis added). Mr. Freyermuth did not testify that the CryEngine code already embedded in *Star Citizen* and *Squadron 42* was removed from those games, and, on information and belief, to do so would be a technical impossibility absent starting development over from scratch. Rather, Mr. Freyermuth is suggesting that CIG "switched" licenses from the GLA to the Amazon license. Two points follow from this. First, CIG's arguments in its brief that "Crytek's code will no longer be in use" appear to either be inaccurate or a very loose characterization of the facts. Second, while CIG is no doubt free to take a second license to the CryEngine from Amazon, CIG cannot unilaterally revoke the GLA by doing so. So long as the CryEngine remains embedded in CIG's games, CIG must abide by the GLA and is currently in breach of multiple terms of the GLA.

### B. Crytek's Claims Are Meritorious and Commercially Meaningful

Because CIG remains bound by the GLA, many of CIG's arguments regarding Crytek's claims become untenable as detailed below. When viewed in conjunction with Crytek's litigation objectives, if any party has a reasonable possibility of being named a prevailing party, it is Crytek.

<u>Crytek's Credits.</u>

CIG has breached and remains in breach of the GLA by removing Crytek's credits from the *Star Citizen* page when the game continues to employ CryEngine

CRYTEK'S RESPONSE TO DEFENDANTS' MOTION FOR BOND
4

code. As noted above, CIG's own statements establish that it continues to use the CryEngine covered by the GLA. It is entirely immaterial that CIG chose to take an additional license to the CryEngine code already embedded in *Star Citizen* and *Squadron 42* from Amazon. At least by continuing to use the CryEngine, CIG remains bound by the terms of the GLA regardless of any subsequent license from Amazon. Indeed, the simple determination that CIG continues to use the CryEngine is determinative of its breach of this term. Put simply, so long as the CryEngine is in *Star Citizen*, CIG must give Crytek due credit under the terms of the GLA. CIG admits it removed Crytek's credits. Dkt. 57-1 at 16. Thus, once Crytek confirms that CIG continues to use the CryEngine code, breach is a non-issue.

Crytek will also be able to show damages (both monetary and reputational) for CIG's failure to display its credits. The success of *Star Citizen* rests on its use of the CryEngine. CIG has relied on the CryEngine since *Star Citizen*'s inception and continues to rely on it now for development. CIG's failure to give Crytek credit for its part in the development of *Star Citizen* deprives Crytek of obvious and valuable brand development for Crytek itself. More problematically, by publicly claiming it has switched to the Lumberyard engine in conjunction with removing Crytek's credits, it is Amazon's Lumberyard engine that is reputationally benefitting when it is Crytek's reputation and brand that should be enhanced. This loss in marketing and branding rights is both monetarily valuable as far as past losses, but it is also a harm that can be equitably rectified going forward in terms of specific performance. Crytek's credits should be returned to *Star Citizen*, and that is certainly one of Crytek's objectives in this litigation. The merits of Crytek's claim are straight-forward and Crytek's credits being returned to the splash screen of *Star Citizen* is in line with one of Crytek's significant litigation objectives.

Bug Fixes.

The GLA very clearly requires CIG to provide its bug fixes "annually." Dkt. 20-3, at ¶ 7.3. Despite this, CIG takes the position the contract sets out, no "fixed time"

for performance, and that CIG was only obligated to fulfill its contractual obligations upon request. CIG does not explain how the term "annually" does not constitute a fixed time. Nor do the cases relied on by CIG suggest that the requirement for annual delivery is not "fixed." Indeed, there are only two possible, reasonable understandings of "annually" under the GLA: once every year on the anniversary of the GLA's execution *or* December 31 of every year. CIG's attempts to impose a duty on Crytek, who was not in a position to know when CIG implemented bug fixes, to request bug fixes is facially absurd. If CIG implemented bug fixes, it was required to provide them annually. It did not do so, and this failure is a breach of the GLA.

CIG notes that it has now provided its bug fixes. Dkt. 57-1 at 15. Of course, this occurred only after Crytek filed this lawsuit. Such post-filing activity cuts against CIG's position on the present motion. CIG's untimely attempt to rectify a breach only after being confronted with a lawsuit is tantamount to an "early payment" which the Court may consider in assessing prevailing party status. Indeed, the delivery of these long overdue fixes to Crytek is a victory in and of itself that the Court ultimately should weigh in Crytek's favor in the prevailing party analysis.

BugSmashers.

At the outset, CIG does not dispute that it published portions of Crytek's confidential CryEngine source code without permission. Instead, CIG sets forth a number of reasons why its publishing of the CryEngine code in breach of the GLA should be excused. With respect to CIG's excuses, Crytek has not made its own code "publicly available." Rather, interested parties can secure a license and then download the CryEngine code subject to the terms of that license, including restrictions on further disclosure. Crytek's business model should not deprive it of the right to control public dissemination of its code, which is exactly what CIG did.

CIG next asserts that Crytek will not be able to establish monetary damages for this breach. CIG's "breach is acceptable as long as Crytek can't prove monetary harm" attitude is cavalier and disturbing. It ignores that Crytek is entitled to equitable relief

ordering CIG to take down its BugSmashers videos and cease publishing future videos that show confidential CryEngine code in violation of the GLA. CIG should not be permitted to violate the GLA and use Crytek's code in the process of enhancing its own brand and reputation. These are meaningful and legitimate concerns, and stopping these unfair tactics is important to Crytek's business. CIG's premise that if it does not have to pay a monetary award, it gets a free pass is mistaken and ignores business and commercial realities that are important to Crytek.

<u>Squadron 42.</u>

CIG's primary argument—that there can be no breach until *Squadron 42* is released—lacks merit. Crytek's *Squadron 42* claim is premised on paragraph 2.1.2 of the GLA which grants CIG the right "to exclusively embed CryEngine in the Game and develop the Game[.]" Dkt. 20-3 at ¶ 2.1.2. Thus, the conduct underlying Crytek's allegations of breach is not the ***release*** of the Game, but rather the ***development*** of the Game. CIG had no right to use CryEngine in development of a stand-alone game such as *Squadron 42*. Because that development has already occurred and continues to occur, CIG is wrong that the "time for performance" has not yet arrived. Dkt. 57-1 at 12.

CIG premises its argument on the description of the Game provided in Exhibit 2 of the GLA. In relevant part, that description provides:

> For the avoidance of doubt, the Game does not include any content being sold and marketed separately, and not being accessed through the Star Citizen Game client, e.g. a fleet battle RTS sold and marketed as a separate, standalone PC game that does not interact with the main Star Citizen game (as opposed to an add-on / DLC to the Game).

Dkt. 20-3, at Ex. 2. CIG's interpretation of this description and its resulting impact on CIG's contractual obligation is flawed in several key ways. First, CIG is wrong that "Exhibit 2 to the GLA prohibits CIG from selling or marketing *Squadron 42* as a separate unit ***only if players can actually access the standalone game***." Dkt. 57-1 at

12. As noted above, Crytek's breach claim is based on the development of the Game, not the release of the Game. So, the relevant question is whether CIG is ***developing*** *Squadron 42* to be "sold and marketed separately and not being accessed through the Star Citizen Game client" such that it would not constitute the Game—rendering CIG's development activities a breach of the GLA. CIG's public representations and statements in its opening brief suggest that it has been developing *Squadron 42* as a game that would be "sold and marketed separately and not being accessed through the Star Citizen Game client". For example, on December 22, 2017—after its public statements regarding the functional tie between *Star Citizen* and *Squadron 42*—the *Star Citizen* Youtube channel posted a video that publicly described *Squadron 42* as "standalone." *See* Ex. A. In its opening brief, CIG further suggests that "when CIG does release *Squadron* 42, the game engine source code will be licensed under CIG's separate agreement with Amazon, not Crytek" and thus "the restrictions in [the GLA] have no application to that future release." Dkt. 57-1, at 12-13.  Setting aside that the Amazon license does not void the GLA as noted above, CIG is acknowledging that *Squadron 42* will be released as a game that is not only accessible through the *Star Citizen* game client and, importantly, the development that has already taken place of such a standalone game is in violation of the GLA.  Such development is a currently existing breach of the GLA that is presently actionable.

Second, CIG omits a key comma, emphasized in the block quote above, from its reproduction of the language describing the Game. The inclusion of that comma alters the description, rendering the "content being sold and marketed separately" a distinct clause from "and not being accessed through the Star Citizen Game client." Viewed with the punctuation intact, it is clear that ***either*** selling and marketing content separately ***or*** content not being accessed through the *Star Citizen* game client would fall outside the scope of the Game. Here, there is no dispute that CIG is already separately marketing and selling *Squadron 42* separate from *Star Citizen*. Thus, *Squadron 42* does not meet the definition for the Game, and CIG's development of

*Squadron 42* constitutes a presently actionable breach for this additional reason.

CIG's development activities relating to a standalone game, whether released or not, are not covered by the GLA. Those development activities have deprived Crytek of fair compensation. The compensation paid by CIG for the GLA was only for development activities on content fitting within the definition of the Game. CIG has developed *Squadron 42* as a standalone game without having paid any compensation for that right. While Crytek may or may not be entitled to monetary damages depending on what discovery reveals about CIG's intent (as discussed further below), Crytek is certainly entitled to equitable relief that blocks further development or utilization of *Squadron 42* that in any way includes code developed without proper license rights. Again, the Amazon license cannot retroactively fix unlicensed development activities, and it is Crytek's objective to either be compensated for those unlicensed activities or to equitably prevent CIG from enjoying the benefits of its breach. Furthermore, to the extent *Squadron 42* is found to fall outside the GLA's terms as an unlicensed game, CIG would be liable for copyright infringement at least up to the date of the Amazon agreement.

<u>Faceware.</u>

CIG asserts Crytek's information with respect to this claim is simply wrong. While Crytek has good reason to believe this disclosure occurred, it would be happy to learn it is wrong. Discovery will quickly resolve the question. Crytek's objective here, as with the BugSmasher claim, is simply to insure that CIG has not and does not wrongfully disclose the CryEngine source code for its own benefit.

<u>Intentional Breach</u>.

Whether CIG is ultimately found to have intentionally breached the GLA should have little, if any, weight in the determination of whether Crytek has met its litigation objectives and thus is a prevailing party. Paragraph 6.1.4 of the GLA is nothing more than a limitation on monetary damages; it is not a heightened requirement for establishing breach. Indeed, as noted above, if Crytek succeeds on the merits of its
CRYTEK'S RESPONSE TO DEFENDANTS' MOTION FOR BOND

breach claims, paragraph 10.7 of the GLA makes explicitly clear that Crytek would be entitled to equitable relief. Crytek successfully obtaining equitable relief would satisfy many of its litigation objections and would support a finding that Crytek is the prevailing party, whether or not it ultimately is entitled to monetary relief. With respect to monetary relief, it is obvious that CIG violated and violates its promotion duties intentionally. Although knowing that it did not change the code base of the game engine and knowing that the GLA contains the obligation to promote CryEngine while CIG was using it, CIG intentionally removed Crytek´s credits. With regard to Squadron42, CIG's intentionality is also obvious as shown above, but Crytek will seek discovery demonstrating that, before CIG entered the Amazon license—CIG's principle explanation—its activities in developing *Squadron 42* as a stand-alone game were knowingly and intentionally in breach of the GLA.  Regardless, if monetary damages are not available, Crytek seeks equitable relief blocking any further use or development of *Squadron 42* using the CryEngine as that entire game is now built on unlicensed development activities.

### IV.   CIG'S BOND REQUEST IS EXCESSIVE

In addition, CIG has requested an excessive bond in the amount of $2,193,298.45 to secure CIG's putative award of costs and attorneys' fees. Here CIG asserts that the claims are unusually complex while simultaneously asserting that Crytek's remaining claims are "meritless" and "only a rump set of quibbles." Dkt. 57-1 at 10; 11. If Crytek's claims are "meritless" "quibbles," they should not require such an exorbitant amount of fees and expenses for CIG to defend.  The reality is that CIG seeks an inflated bond that is disconnected from what this case should actually require. CIG's fees to date illustrate this fact. CIG has already incurred almost $400,000 in fees despite only recently moving past the pleadings stage of this litigation. Dkt. 57-16 at 6. That amount is staggering given CIG's dismissive characterization of this case and suggests that CIG's fees ultimately will not be found to be "reasonable" as required by the GLA. Indeed, in reaching its estimation CIG relies largely on subjective

metrics: (1) attorney experience; (2) nature and complexity of the case; (3) amount in controversy; and (4) conduct of Crytek and its counsel. *Id*. at 7. None of these, however, are anything more than subjective "say so." And these subjective assessments are coming from the same attorneys that deemed Crytek's claims "meritless" "quibbles." While Crytek disagrees that its claims are either "meritless" or "quibbles," both parties seemingly agree that the litigation of these claims should be straightforward. As the Court can likely discern from the explanations above, the questions at issue are not particularly complicated. Indeed, they are quite simple. Thus, the "nature and complexity" of the case supports a minimal fees award. Similarly, the amount in controversy cannot support CIG's request because that amount has yet to be determined—discovery is in its early stages and there has been no expert testimony on the matter. Finally, to the extent the conduct of Crytek's counsel was relevant at all to this estimation, Crytek's counsel has changed rendering CIG's stated concerns moot. Finally, CIG has not set forth any credible rational or objective evidence in its opening brief to suggest otherwise.

<u>Need for Source Code Expert.</u> CIG superficially suggests that Crytek's remaining claims will require "substantial" "expert fees and legal fees related to source code analysis." Dkt. 57-1 at 21. At the outset, expert fees are explicitly excluded from awards of costs under California law absent an order from the Court. *See* Cal. Civ. Proc. Code § 1033.5(b)(1). And CIG has provided no reason to believe such an order would be issued here, as a review of the disputes identified by CIG should not turn on source code analysis. Whether CIG is still using some or all of the CryEngine is a simple fact issue that should be determined through normal discovery means. Similarly, as CIG has noted, it has already delivered its bug fixes to Crytek (after the filing of this lawsuit), so it is unclear what possible source code analysis would be necessary for that claim. Finally, regarding BugSmashers, the only claim that directly implicates the code itself, the primary question for breach is whether CIG did in fact include portions of the code in its videos—a fact that CIG does not appear to contest.

CIG has not explained why an expert code analysis would be required to answer any of these questions.

<u>Crytek's Discovery Approach and Litigation Counsel.</u> Crytek's counsel has changed rendering CIG's arguments as to Crytek's counsel and its discovery approach moot. Crytek will not be engaged in a scorched earth approach to this lawsuit, but rather intends to take a focused approach to establish its above-articulated claims. Similarly, there is no basis to assert that Crytek's new counsel will seek anything other than normal means to streamline this litigation and CIG's concerns regarding Crytek's prior counsel are moot and should have no impact on CIG's motion for bond.

<u>CIG's $200 Million in Crowdfunding.</u> While Crytek certainly has been damaged by CIG's multiple contract breaches and should therefore be entitled to monetary relief if the intent provisions of the GLA are satisfied, Crytek has not yet placed any value on its monetary demands other than to note that the requirements for diversity jurisdiction are satisfied. Crytek's discussion of CIG's crowdfunding is indicative of both the commercial and equitable impacts of CIG's breach: despite having raised $200 million in crowdfunding—which discovery will show that current CIG employees (former Crytek Technical Director Sean Tracy and COO Car Jones) largely credited to Crytek's promotional efforts—CIG had no trouble disregarding its contractual obligations to Crytek the minute it became convenient. This context is not a monetary demand—it is context to explain why Crytek is seeking and entitled to equitable relief from the Court in the forms noted above and, it is context for Crytek's eventual calculation of a monetary award should the other relevant conditions of the GLA be satisfied.  Crytek is fairness driven, not money driven, and if fairness ultimately means nothing more than stopping CIG in its tracks because monetary relief is not available, that would meet Crytek's objectives.

As set forth above, CIG's estimated fees is not premised on any objective assessment of the requirements of this case. In fact, CIG's estimate appears directly tied to the cap on Crytek's maximum aggregate liability (€1,850,000 as of November

20, 2012 equaling $2,370,590) set forth in paragraph 6.1.4 of the GLA. Of course, the maximum allowable recovery under the GLA should have no bearing on the estimation of a reasonable bond in this particular litigation.

## V.     CONCLUSION

For the foregoing reasons, Crytek respectfully requests that the Court deny CIG's Motion for Bond. In the alternative, should this Court find a bond warranted, Crytek requests the required bond be substantially decreased to reflect the relatively straightforward nature of the remaining claims at issue.

DATED: June 7, 2019

                ERISE IP, P.A.

                By: */s/ Eric A. Buresh*
                      Eric A. Buresh (*pro hac vice*)
                      Attorneys for Plaintiff
                      CRYTEK GMBH